# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### SHREVEPORT DIVISION

| | |
|---|---|
| ERIC MOORE | CIVIL ACTION NO. 20-1339 |
| VERSUS | JUDGE ELIZABETH E. FOOTE |
| BIO-MEDICAL APPLICATIONS OF LOUISIANA, LLC | MAG. JUDGE KAYLA D. MCCLUSKY |

## MEMORANDUM RULING

Before the Court is a motion to dismiss or, in the alternative, to stay these proceedings by Defendant, Bio-Medical Applications of Louisiana, LLC d/b/a Fresenius Kidney Care South Shreveport ("Fresenius").[1]  Fresenius argues that Plaintiff's claims are subject to the rules governing Louisiana medical malpractice claims and are premature pending a medical panel's review.  Plaintiff, Eric Moore, individually and on behalf of his mother, Ruthie Moore, opposes the motion and argues that his claims against Fresenius sound in ordinary negligence, not malpractice.[2]   For the reasons outlined below, Fresenius's motion to dismiss or stay[3] is **DENIED**.

### I. Background

Since 2014, Ms. Ruthie Moore ("Ms. Moore") was a regular patient at Fresenius Kidney Care in Shreveport, Louisiana.[4]  She was wheelchair-bound and suffered from diabetes, kidney disease, and dementia, which caused short term memory loss.[5]  In the

---

[1] Record Document 20.
[2] Record Document 23.
[3] Record Document 20.
[4] Record Document 1-2, p. 4.
[5] *Id.* at pp. 4−5.

last few years of her life, Ms. Moore lived with her son, Plaintiff, who served as her principal caretaker.[6]

Ms. Moore required routine dialysis and Plaintiff was responsible for taking his mother to her scheduled appointments at Fresenius.[7]  Because of his work schedule, Plaintiff would frequently drop Ms. Moore off in the mornings and pick her up in the afternoons.[8] At times, Ms. Moore would endure long waits following her treatments.[9]  For years, she would spend the duration of these periods in Fresenius's waiting room until her son was able to return.[10]

But while waiting after an appointment in 2017, Plaintiff claims that Ms. Moore slipped from her wheelchair in the waiting room before he arrived to take her home.[11] Following the incident, Plaintiff alleges he reached an informal agreement with Fresenius's staff.[12]  Instead of placing Ms. Moore in the waiting room after dialysis, Plaintiff claims that Fresenius agreed to place his mother in an area where the staff could monitor her condition until Plaintiff returned from work.[13]

A few years later, on October 22, 2019, Plaintiff dropped Ms. Moore off at Fresenius for her routine appointment.[14]  As scheduled, Ms. Moore underwent her required dialysis

---

[6] *Id.*

[7] *Id.*

[8] *Id.* at p. 5.

[9] *Id.*

[10] *Id.*

[11] *Id.*

[12] *Id.*

[13] *Id.*

[14] *Id.*

for three hours.[15]   Following her treatment, Ms. Moore had to wait until Plaintiff was available to take her home.[16]   Considering the informal agreement reached between Plaintiff and Fresenius, Plaintiff claims that the Fresenius staff did not place Ms. Moore in the regular waiting room.[17]  Instead, Plaintiff alleges that the Fresenius staff stationed her wheelchair in the doorway of the nursing station, which linked the dialysis treating area with the waiting room.[18]

Twenty minutes later, Plaintiff claims a large man in an electric scooter drove through the doorway from the waiting room to begin his dialysis.[19]  As he steered into the treatment area, Plaintiff states that the man's device collided with Ms. Moore's body and her wheelchair.[20]  Plaintiff alleges that the impact from the accident knocked Ms. Moore to the ground where she lay with a "profusely" bleeding forehead and broken leg.[21]  Once emergency medical services arrived at the clinic, they transported Ms. Moore to a hospital in Shreveport where doctors stitched her forehead and treated her broken leg with a knee immobilizer.[22]   Months after her hospital discharge, Plaintiff claims that Ms. Moore regularly used the immobilizer and eventually developed a pressure wound on her left

---

[15] *Id.*
[16] *Id.*
[17] *Id.*
[18] *Id.*
[19] *Id.*
[20] *Id.*
[21] *Id.*
[22] *Id.*

foot.[23]   Along with her head injury, the pressure wound required continuous monthly care.[24]  Unfortunately, in September 2020, Ms. Moore passed away.[25]

Plaintiff now brings this wrongful death and survival action against Fresenius Kidney Center.  He alleges negligence on the part of the Fresenius staff and argues that this negligence was the direct and proximate cause of Ms. Moore's death.[26]  In response, Fresenius filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) or a motion to stay the proceedings pending a medical panel's review.[27]

## II. Rule 12(b)(6) Standard

Federal Rule of Civil Procedure 12(b)(6) allows for dismissal of an action "for failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  While a complaint attacked by a Rule 12(b)(6) motion need not contain detailed factual allegations, in order to avoid dismissal, the Plaintiff's factual allegations must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation omitted).  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citation omitted).  In determining whether a plaintiff has pled factual allegations to state a claim that is plausible, the Court may not evaluate the Plaintiff's likelihood of success but must construe the complaint

---

[23] *Id.* at p. 6.
[24] *Id.*
[25] *Id.*
[26] *Id.* at p. 7.
[27] Record Document 20.

4

liberally and accept all of the Plaintiff's factual allegations in the complaint as true.  *See In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

## III. Law and Analysis

Based on the allegations in the pleadings and other facts developed through discovery, Fresenius asserts that Plaintiff's claims are covered under the Louisiana Medical Malpractice Act ("LMMA").[28]   Under the LMMA, a plaintiff may not file suit for medical malpractice unless the claim is first reviewed by a medical review panel.  La. R.S. § 40:1231.8(A)(1)(a) & B(1)(a)(i).  Plaintiff, on the other hand, argues that a medical panel's review is unnecessary because his claims do not constitute medical malpractice.[29]   The relevant issue for the Court to determine, then, is whether Plaintiff's claims fall under the LMMA, or whether his claims sound in ordinary negligence.

Malpractice under the LMMA is defined as "any unintentional tort . . . based on health care or professional services rendered, or which should have been rendered, by a health care provider, to a patient, including failure to render services timely and the handling of a patient . . . ."  *Id.*  § 40:1231.1(A)(13).  Louisiana courts have cautioned that this language should be "strictly construed" because the LMMA was passed as special legislation "in derogation of the rights of tort victims."  *Sewell v. Drs. Hosp.*, 600 So. 2d 577, 578 (La. 1992).  The LMMA's limitations, therefore, "apply only in cases of liability for malpractice as defined in the [LMMA]."  *Id.*  In this case, both Plaintiff and Fresenius agree

---

[28] *Id.* at p. 8.
[29] Record Document 23, p. 2.

that the Fresenius clinic is a "qualified healthcare provider" under the Act, though they disagree about whether the Fresenius staff's alleged negligence constitutes malpractice.

Determining whether an alleged wrong falls within the confines of the LMMA requires a court to consider the following six factors as outlined by the Louisiana Supreme Court outlined in *Coleman v. Deno*:

(1)    whether the particular wrong is "treatment related" or caused by a dereliction of professional skill,

(2)    whether the wrong requires expert medical evidence to determine whether the appropriate standard of care was breached,

(3)    whether the pertinent act or omission involved assessment of the patient's condition[,]

(4)    whether an incident occurred in the context of a physician-patient relationship, or was within the scope of activities which a hospital is licensed to perform,

(5)    whether the injury would have occurred if the patient had not sought treatment, and

(6)    whether the tort alleged was intentional.

2001-1517 (La. 1/25/02); 813 So. 2d 303, 315–16 (quotations omitted).   In weighing the factors, courts should resolve "any ambiguity . . . in favor of the plaintiff and against finding that the tort alleged sounds in medical malpractice." *LaCoste v. Pendleton Methodist Hosp., L.L.C.*, 2007-0008 (La. 9/5/07); 966 So. 2d 519, 524.   Each *Coleman* factor is addressed individually below.

The first factor asks whether the particular wrong is "treatment related" or caused by a dereliction of professional skill. *Coleman*, 813 So. 2d at 315.   This factor requires the Court to consider if the negligence Plaintiff alleges is "directly related to" or "involve[s]"

6

Ms. Moore's "treatment" at Fresenius. *Williamson v. Hosp. Serv. Dist. No. 1 of Jefferson*, 2004-0451 (La. 12/1/04); 888 So. 2d 782, 790. Fresenius claims that the clinic's policies require its staff to monitor high risk patients like Ms. Moore after their dialysis.[30] It argues that Ms. Moore was at a heightened risk of slipping from her wheelchair and unable to be left alone unsupervised because of her dementia and other co-morbidities.[31] Fresenius attempts to read a "failure to monitor" claim into Plaintiff's petition and argues that such a claim is invariably related to treatment.[32] It contends, moreover, that Ms. Moore was confined at the clinic and "handled" by the staff when they placed her at the nursing station.[33] For these reasons, it claims the alleged negligence on the part of the staff was "treatment related."[34]

A distilled reading of Plaintiff's claims, however, shows that the alleged particular wrong was Fresenius's placement of Ms. Moore and her wheelchair in an unsafe position. The Court concludes that this allegation is unrelated to the medical treatment Ms. Moore received at the Fresenius clinic. Importantly, Plaintiff does not claim that Ms. Moore was injured during her prescribed dialysis or because she was medically neglected by staff at the clinic. *See, e.g.*, *Harris v. Sternberg*, 2001-1827 (La. App. 4 Cir. 5/22/02); 819 So. 2d 1134, 1136 (holding that a plaintiff's claims fell under the LMMA because the patient was wounded during his treatment); *McLemore v. Westwood Manor Nursing & Rehab., L.L.C.*, 37-450 (La. App. 2 Cir. 8/20/03); 852 So. 2d 1170, 1173 (holding that a plaintiff's claims

---

[30] Record Document 20, p. 17.
[31] *Id.*
[32] *Id.*
[33] *Id.* at p. 18.
[34] *Id.*

fell under the LMMA because the patient was dropped by nursing home staff and did not receive medical attention).

Rather, Plaintiff claims that Ms. Moore's direct injuries stem from the acts of a third-party patient, carried out twenty minutes following her prescribed treatment. He argues that the staff, in placing Ms. Moore near the nursing station, exposed her to unreasonable risk. Therefore, because the alleged negligent act and the ensuing accident are fully divorced from Ms. Moore's dialysis, the Court holds that Plaintiff's claims fall outside the realm of medical "treatment." Though the staff may have "handled" Ms. Moore when they moved her after her dialysis, the placement of her wheelchair in a hazardous area does not rise to the level of malpractice. *See Richard v. Louisiana Extended Care Ctrs., Inc.*, 2002-0978 (La. 1/14/03); 835 So. 2d 460, 468 (stressing that a negligent act must be "related to medical treatment").

Further, the Fresenius staff did not exercise "professional skill" in placing Ms. Moore in the entryway or by failing to thwart third party actors. "[T]he significance of the term "malpractice" is that it is used to differentiate professionals from nonprofessionals for purposes of applying these statutory limitations of tort liability." *Williamson*, 888 So. 2d at 790. Here, "there has been no showing that a dereliction of professional medical skills resulted in the injury to the plaintiff." *Id.* And for this and the above stated reasons, the Court holds that this first factor tends to show that Plaintiff's allegations are based in general negligence rather than malpractice.

The second *Coleman* factor asks whether the wrong requires expert medical evidence to determine whether the appropriate standard of care was breached. *Coleman*,

8

813 So. 2d at 315.  "[W]hen a medical malpractice case involves allegations of 'obvious negligence,' no expert testimony is required to establish a physician's fault."  *Harris*, 819 So. 2d at 1140 (citing *Pfiffner v. Correa*, 94-0924 (La. 10/17/94); 643 So. 2d 1228). Fresenius argues that expert medical evidence will be necessary to determine if there was a breach in the standard of care.[35]  Specifically, it believes experts will need to offer testimony on whether Fresenius properly assessed Ms. Moore's mental and physical conditions before she was injured in the accident.[36]  The Court holds, however, that the act of negligently placing Ms. Moore's wheelchair in an allegedly dangerous area is an act that can be understood with common knowledge and does not warrant medical experts. Because expert *medical* evidence is likely not required to determine whether Fresenius's staff breached the standard of care, this factor also supports a finding that this case sounds in ordinary negligence.  *See Williamson*, 888 So. 2d at 790.

The third factor asks whether the pertinent act or omission involved an assessment of the patient's condition.  *Coleman*, 813 So. 2d at 315.  In other words, the Court must determine whether the alleged negligent act implicated an assessment of Ms. Moore's medical status by the Fresenius staff.  *See Williamson*, 888 So. 2d at 790*.* Fresenius claims that the clinic's staff typically discharged dialysis patients into the waiting room after treatment.[37]  In Ms. Moore's unusual case, however, Fresenius notes that the staff isolated her from the waiting room for monitoring.[38]  Inherent in this decision, Fresenius argues,

---

[35] *Id.*

[36] *Id.*

[37] *Id.*

[38] *Id.*

is the assessment of Ms. Moore's condition considering her litany of ailments.[39]  Fresenius thus contends that this factor supports a finding that Plaintiff's claims sound in malpractice.[40]

The Court disagrees.  The pertinent act here was not the staff's decision to exclude Ms. Moore from the general waiting area based on her health issues.  Rather, the alleged negligent act was the staff's placement of her wheelchair in a hazardous doorway. According to Plaintiff's petition, the parties informally agreed to provide a space for Ms. Moore outside the waiting room for her post-dialysis waits long before the accident occurred.  As a result, placing Ms. Moore at the nursing station doorway on the day of her injury was not "judgment-related" based on Ms. Moore's condition *that particular day*.  *See Jordan v. Stonebridge, L.L.C.*, 03-588 (La. App. 5 Cir. 11/25/03); 862 So. 2d 181, 184. Rather, providing Ms. Moore an area in which to wait was a routine act Fresenius's staff habitually performed.  In other words, "the allegation of negligence [does not] pertain to . . . the decision to transport, the means of transport, or an assessment of the patient's condition necessitating use" of a holding area.  *Rivera v. Bolden's Transp. Serv., Inc.*, 2011-1669 (La. App. 1 Cir. 6/28/12); 97 So. 3d 1096, 1104; *see also Williamson*, 888 So. 2d at 790−91 ("There is simply no showing that this plaintiff's transportation by wheelchair to the parking lot involved an assessment of her condition by the hospital's employee. . . .").  Additionally, the injuries Ms. Moore suffered were not directly related to a medical

---

[39] *Id.*
[40] *Id.* at pp. 18−19.

ailment or condition the staff failed to assess or monitor.  As a result, this third factor weighs against the application of the LMMA.

The fourth factor asks whether the incident occurred in the context of a physician-patient relationship, or was within the scope of activities which a hospital is licensed to perform.  *Coleman*, 813 So. 2d at 316.  In applying this factor, a court may look to whether the incident was related to a patient's prescribed treatment plan or medical service.  *See Romero v. Willis-Knighton Med. Ctr.*, 38-374 (La. App. 2 Cir. 4/7/04); 870 So. 2d 474, 479.  Fresenius notes that Ms. Moore required dialysis for years and chose the Fresenius clinic as her regular treatment provider.[41]  Because of her routine visits, Ms. Moore and Plaintiff knew the staff, and the staff had knowledge of Ms. Moore's many ailments.  With this relationship in mind, Fresenius argues that its decision on where to move and place Ms. Moore was not made in a vacuum.[42]  Instead, it claims that the decision was made in the context of a provider-patient relationship.[43]  Plaintiff responds that the decision to keep Ms. Moore away from the waiting room was the result of an informal agreement, unconnected to any physician-prescribed treatment plan.[44]

Taking Plaintiff's claims as true, placing Ms. Moore at the nursing station was not a consequence of a care plan between a physician and her patient, it was the result of "an arrangement made between Mr. Moore and the administrator of the facility."[45]  Moreover, the alleged negligent act "occurred in the routine [placement], by *staff*," of Ms. Moore in

---

[41] *Id.* at p. 19.
[42] *Id.*
[43] *Id.*
[44] Record Document 23, p. 6.
[45] *Id.*

a holding area after her treatment.  *Jordan*, 862 So. 2d at 184 (emphasis added).  Plaintiff alleges that no physician was present.  Consequently, the incident was not related to a physician-patient relationship.  *See id.*

Additionally, while Fresenius may often move and situate wheelchair-bound patients like Ms. Moore after their treatment, Fresenius "engage[s] in all sorts of activities, and not every activity requires licensing from the state."  *Williamson*, 888 So. 2d at 791. Certainly, there is no license needed to move and position individuals in wheelchairs. Considering these reasons, this fourth factor also guides the Court toward a finding that Plaintiff's claims sound in ordinary tort law.

The fifth factor considers whether the injury would have occurred if the patient had not sought treatment.  *Coleman*, 813 So. 2d at 316.  Louisiana courts often apply a "but for" test when considering this factor.  *Williamson*, 888 So. 2d at 791.  In applying the test to these facts, Ms. Moore would not have been injured had she not sought dialysis treatment from the Fresenius clinic.  Even so, the Louisiana Supreme Court has cautioned that this "but for" rationale may be overly facile.  *Id.*; *see also Taylor v. Ochsner Clinic Found.*, 11-1926, 2011 WL 6140885, at *6 (E.D. La. Dec. 9, 2011) (finding that "no one *Coleman* factor is to receive determinative weight").  In other words, it is just as reasonable to say that any wheelchair-bound visitor to the clinic not seeking treatment could have suffered a similar injury.  *See Williamson*, 888 So. 2d at 791.  Though the Court weighs this factor to support a finding that Plaintiff's claims sound in malpractice, this factor alone is not determinative.  *See id.* at 789.

12

Finally, the sixth factor asks whether the alleged tort was intentional.  *Coleman*, 813 So. 2d at 316.  For a claim to fall under the LMMA, a plaintiff must allege that the defendant committed an unintentional tort.  La. R.S. § 40:1231.1(A)(13).  Here, Plaintiff does not allege an intentional act on the part of Fresenius or its staff.  But as the Louisiana Supreme Court has held, "[n]ot every unintentional tort committed by a qualified health care provider falls within the purview of the LMMA."  *LaCoste*, 966 So. 2d at 527.  Though this last factor weighs in Fresenius's favor, this factor alone is not dispositive.

## IV. Conclusion

Overall, considering the six *Coleman* factors holistically, the Court holds that Plaintiff's alleged misconduct falls outside the LMMA's ambit.  Certainly, in reading Plaintiff's petition and applying the relevant law, there exists some ambiguity.  The Court acknowledges, for example, that not all *Coleman* factors as applied to this case are self-evident, or even weigh in Plaintiff's favor.  Nevertheless, Louisiana law requires this Court to strictly construe "any ambiguities" against a finding of the LMMA's coverage.  *Sewell*, 600 So. 2d at 578.  Therefore, in strictly construing the LMMA and weighing the relevant factors, it is the Court's conclusion that the "tenor" of Plaintiff's petition "presents a cause of action for ordinary negligence as opposed to a breach of a duty" associated with Ms. Moore's medical care.  *Stapler v. Alton Ochsner Med. Found.*, 525 So. 2d 1182, 1184 (La. Ct. App. 5 Cir. 1988).  In short, Plaintiff's claims simply do not rise to the level of medical malpractice.  And as a result, this case does not require an opinion from a medical review panel, and dismissal of the action for prematurity is unwarranted.  Fresenius's motion to

dismiss or stay[46] is therefore **DENIED**.  This matter is **REFERRED** to the Magistrate Judge

for a scheduling conference.

      **THUS DONE AND SIGNED** this 17th day of March, 2022.

                        ELIZABETH ERNY FOOTE

                        UNITED STATES DISTRICT JUDGE

---

[46] Record Document 20.